IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. WR-49,164-02






EX PARTE DERRICK FRAZIER, Applicant








ON APPLICATION FOR A WRIT OF HABEAS CORPUS


FROM REFUGIO COUNTY






 Price, J., filed a statement dissenting to the dismissal of the application.


DISSENTING STATEMENT



 This is a subsequent post-conviction application for writ of habeas corpus in a capital
case, in which the applicant seeks this Court's permission to proceed in the convicting court,
under Article 11.071, Section 5(c) of the Texas Code of Criminal Procedure. (1) In his
subsequent application, the applicant alleges that a juror in the course of his trial
demonstrated gross misconduct, implicating his right to a fair trial under Sixth, Eighth, and
Fourteenth Amendments to the United States Constitution. This is a substantial
constitutional issue that would clearly be cognizable in a timely initial writ application
brought under the auspices of Article 11.071.

 The issue before us is whether the applicant has included in his application "sufficient
specific facts establishing that" the factual basis for his claim "could not have been presented
previously in a timely initial application" brought under Article 11.071 "because the factual
. . . basis for the claim was unavailable on the date the applicant filed the previous
application." (2) A factual claim is "unavailable" within the meaning of this provision if it "was
not ascertainable through the exercise of reasonable diligence on or before that date." (3) The
difficulty that this case exposes is that this statutory language does not clearly designate to
whom the factual basis of the claim must be "ascertainable" as of the time of the filing of the
initial writ application.

The Factual Basis


 For the first time in his subsequent application, the applicant has presented an affidavit
from one of the State's own witnesses from the punishment phase of the capital murder trial,
a woman by the name of Courtney Marie LaFont. LaFont claims that while she was waiting
in the hallway to be called into the courtroom to testify, she observed a female juror emerge
from the jury room. As this juror walked past the husband of one of the victims in the case, 
LaFont heard her say to him, "Don't worry, he's dead." LaFont observed the juror make a
slashing motion across her throat as she was making this statement. Later, after a verdict of
death was pronounced, LaFont saw this same juror wink at the victim's husband as she was
leaving the courtroom. LaFont approached the applicant's trial attorneys and told them what
she had seen. One of the defense lawyers, Stephen Cihal, told her not to worry because "the
judge would take care of it."

 In interviews with the applicant's present counsel, who are representing the applicant
for the first time in this subsequent application, and an investigator, Mr. Cihal expressed a
vague recollection that some kind of juror misconduct was called to his attention, but he
could not remember the particulars. He recalled that he had called the bailiff to testify at
some kind of hearing, but could not remember the testimony adduced. No such hearing
appears in the appellate record. The lawyer who was appointed to represent the applicant on
his direct appeal, Henry Burkholder III, visited with Cihal on two occasions within the first
thirty days of his appointment to the appeal, but Cihal did not tell him anything about jury
misconduct, and the motion for new trial that Burkholder filed on the applicant's behalf was
therefore predicated on other grounds.

 For her part, the attorney who represented the applicant in his initial state writ
application, Julie Pollock, has submitted an affidavit in which she avers that she had "several
conversations with trial counsel and at no time was I told by counsel, or anyone else," of jury
misconduct. She also conducted jury interviews with "many, but not all, of the jurors." 
None of them told her about any jury misconduct. Finally, Pollock attempted to locate
LaFont, apparently just as a matter of course during her investigation of the case, "but was
unable to discover her whereabouts."

 It is apparent to me that Pollock, the initial writ application attorney, exercised
reasonable diligence in her pursuit of any possible jury misconduct claim that could be raised
on the applicant's behalf. I would have preferred that she had told us in her affidavit whether
she actually asked trial counsel the specific question whether they were aware of any facts
that might form the basis of a jury misconduct claim, rather than simply asserting that they
never "told" her of any. But I think it is clear enough that she was interested in jury
misconduct issues by virtue of the fact that she conducted extensive juror interviews, one of
the primary purposes of which is to root out jury misconduct. From this I think it is fair to
infer that she would have inquired of trial counsel about jury misconduct, and not simply
expected them to volunteer the information. I do not know what else Pollock could have
done to expose the alleged misconduct.

By Whom Must the Factual Basis Be "Ascertainable"?


 On its face, Section 5 of Article 11.071 does not specify by whom facts must be
ascertainable before the applicant will be held inexcusably responsible for raising them in
his initial writ application. The requirement of diligence is an objective one in the sense that
the diligence exercised must be "reasonable." But reasonable from whose perspective? The
applicant's own? He is invariably incarcerated on death row, from which he can conduct
little if any meaningful factual investigation. Even the greatest degree of diligence on his
part cannot be expected to uncover much in the way of factual bases for relief beyond what
is contained in the appellate record; and any claim based on the appellate record must
ordinarily be raised on direct appeal or it is lost to him. If not applicant himself, then who? 
The reasonable person charged with the responsibility of representing the applicant's
interests? Does that include the entire defense "team," including trial, appellate and habeas
lawyers? Or does it merely include the lawyer who is representing the applicant in the writ
application, at the time she files the initial writ application?

 Because the statute is ambiguous, we are not prohibited under Boykin v. State (4) from
resorting to extra-textual sources for interpretation, including Section 311.023 of the
Government Code. Subsection (5) of that provision authorizes us to take into account in
construing a statute the "consequences of a particular construction[.]" To my way of
thinking, one overriding deleterious consequence of construing Section 5 of Article 11.071
to make the capital habeas applicant responsible for all facts within the knowledge of all of
his previous attorneys, including the trial and appellate attorneys, is that it ignores the quasi-adversarial relationship that arises between those previous attorneys and state habeas counsel.
We cannot afford to ignore the fact that, once the criminal proceedings have terminated in
the affirmance of a conviction, the trial and appellate lawyers no longer have their former
client's interests exclusively at stake.

 One of state habeas counsel's most important tasks is to grade the papers of the trial
and appellate attorneys, since a Sixth Amendment claim of ineffective assistance of counsel
will be raised in almost every capital post-conviction writ application. State habeas counsel
risks providing incompetent counsel herself if she fails to obtain and review the files of her
predecessor attorneys, intensively interview them, question her own client at length about
their performance, and investigate extra-record sources of information that might shed light
upon that performance beyond the parameters of the appellate record. Obviously, if that
investigation turns up any substantive evidence to support a claim of ineffectiveness of
counsel, state habeas counsel must proceed with it, if she is to represent her own client
competently. Reasonable diligence requires no less.

 But this necessarily creates an inherent tension between previous counsel and state
habeas counsel. Previous counsel may or may not even cooperate with state habeas counsel's
investigation. He may find some reason to withhold his files, and he may or may not always
be completely candid in his responses during the interview. He may suffer lapses of memory,
and find that he cannot afford sufficient time to take away from his busy practice to consult
his files or the appellate record with a view to refreshing it. In other words, notwithstanding
his duty to his former client, he may fall victim to the very understandable, basic human
instinct for self-preservation.

 The fear of consequences from a judicial finding of ineffectiveness of trial or
appellate counsel is not unfounded. It is not just the practical consequences of the damage
that such a finding can do to one's reputation or business. There are concrete, legally
mandated consequences as well. In 2005, the Texas Legislature amended Article 26.052 of
the Texas Code of Criminal Procedure to provide that attorneys who have been found to have
rendered ineffective assistance of counsel to a capital defendant, either in trial or on appeal,
shall no longer be eligible for appointment as lead counsel in future capital murder cases. (5) 
Attorneys in many localities who make a substantial portion of their living in capital trial
and/or appellate work stand to lose the better part of their practices. Under these
circumstances it is not hard to imagine, or indeed at a certain level even to blame attorneys
who somehow cannot find the time adequately to refresh their memories in aid of a diligent
state habeas lawyer. Whether consciously, or maliciously, or not, they may not prove the
most reliable of "team" players.

 Mindful of these considerations, I would resolve the ambiguity of Article 11.071,
Section 5 of the Code of Criminal Procedure by holding that capital habeas applicants must
be held accountable for all facts within the knowledge of state habeas counsel, or which
could have been known to her by the exercise of reasonable diligence, at the time she files
her initial application for writ of habeas corpus. If state habeas counsel did not know, and 
could not have been expected to know by the exercise of reasonable diligence, of a factual
basis for habeas corpus relief at the time of the initial writ, the applicant should be entitled
to pursue the claim in a subsequent writ, and we should permit it as is within our authority
to do under Article 11.071, Section 5 (c). Here, Pollock could not have known of the jury
misconduct claim by the exercise of reasonable diligence at the time she filed the applicant's
initial writ application. The applicant should be allowed to pursue it now. It should not
matter to the Court what her trial attorneys knew, so long as Pollock made a reasonably
diligent effort to discover what they knew, without success. (6)

 Because the Court nevertheless dismisses the applicant's subsequent writ application,
I respectfully dissent.

Filed: June 28, 2006.

Publish.
1. 

 An execution date for the applicant was originally scheduled for Thursday, April 27, 2006,
but this Court stayed that execution on April 24, 2006, in order to consider whether to allow him to
proceed under Article 11.071, Section 5 of the Texas Code of Criminal Procedure.
2. Tex. Code Crim. art. 11.071, § 5 (a) (1).
3. Tex. Code Crim. art. 11.071, § 5 (e).
4. 818 S.W.2d 782, at 785-86 (Tex. Crim. App. 1991).
5. See Acts 2005, 79th Leg., ch. 787, § 14, eff. Sept. 1, 2005; Acts 2005, 79th Leg., ch. 965, §
7, eff. Sept. 1, 2005.
6. There is no suggestion that the applicant himself ever became aware of the alleged jury
misconduct. Obviously if the applicant had an awareness of the misconduct but never shared that
knowledge with his state habeas counsel, and/or she never asked him about the specifics of it, we
would be presented with an entirely different question.